# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **Dyshawn Underwood, individually, and as guardian of minor child K.U.,** : | |
| : | |
| **Plaintiffs,** | |
| : | |
| vs. | |
| : | |
| **Blue Leaf Residential Mgmt., LLC** | **COMPLAINT AND DEMAND FOR** |
| **dba College Park Apartments,** : | **JURY TRIAL** |
| c/o Platinum Filings, LLC | |
| 4568 Mayfield Rd. #204 : | |
| Cleveland, Ohio 44121 | |
| : | |
| and | |
| : | |
| **Cyclone Columbus Park 250 LLC,** | |
| c/o Platinum Filings, LLC : | |
| 4568 Mayfield Rd. #204 | |
| Cleveland, Ohio 44121 : | |
| | |
| **Defendants.** | |

## PRELIMINARY STATEMENT

1. This is a legal action for damages filed by Ms. Underwood, a mother, and her toddler, K.U., against Defendants for failing to make essential repairs to their home, refusing to accommodate K.U.'s disabilities when he was only one year old, and retaliating against Ms. Underwood for exercising her baby's rights under the Fair Housing Act. Defendant's negligence and flagrant disregard of reasonable accommodation requests caused severe harm to little K.U., including multiple emergency room visits and two ICU stays, and caused Ms. Underwood to miss work and fall behind on her rent. Despite repeated requests for repairs and accommodations, Defendants delayed action for months and failed to grant reasonable accommodation requests resulting in this

1

action under the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601, *et seq.* ("the Act") and pendant state law claims.

## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 3613.

3. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391, as the claim arose in Franklin County, Ohio.

## PARTIES

5. Plaintiff Dyshawn Underwood ("Ms. Underwood"), individually and as mother and natural guardian of Minor child "K.U." (d.o.b. 9/22/2022), (collectively "Plaintiffs"), are residents of Franklin County, Ohio.

6. Ms. Underwood resided in the home in question with minor child K.U., and therefore is protected under 42 U.S.C. 3604(f)(2)(B) as she suffered damages resulting from the denial of K.U.'s reasonable accommodation requests and she was the direct target of intimidation, and interference by Defendants after enforcing K.U.'s rights under 42 U.S.C. §§ 3601, *et seq*. For these reasons, Ms. Underwood is an "aggrieved person" under 42 U.S.C. § 3602(i)(1).

7. K.U. is an "aggrieved person" under 42 U.S.C. § 3602(i)(1) because he experienced disability discrimination under 42 U.S.C. 3604(f)(2)(A) when Defendants failed to accommodate his disabilities which resulted in damages.

8. Defendant, Cyclone Columbus Park 250 LLC is a foreign limited liability company registered to do business in Ohio. Defendant, Cyclone Columbus Park 250 LLC, is

the owner of 1743 College Park Dr. Columbus, Ohio 43209 which is an apartment complex called College Park Apartments in Franklin County, Ohio.

9. Defendant Blue Leaf Residential Management LLC is a Delaware corporation registered in the state of Ohio. Blue Leaf Residential Management LLC does business as College Park Apartments and holds themselves out as managers of the property on College Park Apartments' website. *See* College Park Apartment Homes, https://www.collegeparkcolumbus.com/ (last visited Feb. 17, 2025). Blue Leaf Residential Management LLC is hereinafter referred to as "College Park."

## FACTUAL ALLEGATIONS

10. The acts giving rise to this complaint took place at or in reference to a multifamily apartment complex known as "College Park Apartments," located at 1708 Creeksedge Dr, Columbus, OH 43209.

11. Plaintiffs first moved into the apartment located at 1743 College Park Drive, Columbus, Ohio 43209 on or about June 30, 2023.

12. Ms. Underwood and Defendant Cyclone Columbus Park 250, LLC, entered into a Lease Agreement ("Lease"), for apartment number 02-1743 (hereinafter "the premises") at College Park Apartments for a term which commences on June 30, 2023, and ended on May 31, 2024. This lease was signed by Ms. Underwood on July 7, 2023, and Samantha Muldrew signing agent for Defendant Cyclone Columbus Park 250, LLC on July 19, 2023. At the time of lease signing, Defendants were aware that Ms. Underwood was to reside at the premises with her minor child K.U. An authentic copy of lease attached as Exhibit 1.

13. This Lease enumerated the responsibilities of the owner which included but was not limited to acting "with customary diligence to: . . . (3) comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing. . ." *See* Exhibit 1, at 5.

14. This Lease entitled Ms. Underwood to use and occupy the "premises" to the exclusion of others. The Lease required Ms. Underwood, among other things, to pay monthly rent and utilities at the premises and to "promptly notify" Defendants in writing of "water leaks; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety." *See* Exhibit 1 at 5.

K.U.'s Disability

15. K.U. is a two-year-old with disabilities as defined under the Act ("FHA"). He suffers from asthma, bronchiolitis, and pulmonary valve stenosis with an extensive history of respiratory infection and acute respiratory failure.

16. K.U.'s various medical conditions are such that he has impairments to major life activities such as sleeping, walking, talking, breathing, and more.

17. Defendants, at all relevant times, were aware of K.U.'s disabilities.

18. In May 2023, when Plaintiffs lived at a different unit in the complex, Ms. Underwood made the property manager and agent of Defendants aware that K.U. had a disability that could be exacerbated by extremes in temperature by providing her with a letter from K.U.'s doctor. An authentic copy of the letter is attached as Exhibit 2.

19. K.U. was hospitalized for respiratory distress on January 19, 2023. At this time, he was hospitalized for three days and discharged with Rhino/enterovirus bronchiolitis causing acute respiratory failure. During this visit, he was treated with a BiPAP (a non-invasive ventilation), nasal saline and suctioning, and albuterol breathing treatments. At discharge on January 21, 2023, Ms. Underwood was instructed to provide smaller feeds more often, suction his nose as needed for congestion, and administer acetaminophen as needed for pain and fever.

20. On June 1, 2023, K.U. again visited the emergency room for breathing issues but was not admitted and discharged with a diagnosis of acute bronchiolitis with supportive treatments for upper respiratory infections (fluids, rest, clearing the nose and eyes, and Advil and Tylenol as needed).

21. On October 19, 2023, K.U. visited the emergency room for a cough and vomiting and was diagnosed with Croup and provided with a long-acting steroid while at the hospital to help with breathing and supportive treatment recommended at home for viral infection.

22. After K.U. was discharged from the hospital in October 2023, Ms. Underwood notified Defendant's agent Laura Storms, the property manager, that K.U. was disabled by telling her in person at the property management office that he had asthma and could not live with the mold in the apartment.

23. On November 12, 2023, K.U. visited the emergency room for severe respiratory distress and was diagnosed with bronchiolitis, a respiratory infection, and acute respiratory failure with hypoxia. During his ER visit, K.U. was treated with a manual clearing out of his lungs and airways and ipratropium and albuterol nebulizer

5

treatment. When these treatments were unsuccessful, he was put on a BiPAP (a noninvasive ventilation machine) and admitted to the Pediatric Intensive Care Unit (PICU). After being admitted to the PICU, K.U. was sedated, continued BiPAP, and was administered IV fluids. Once K.U.'s acute respiratory failure was resolved, he was discharged from the hospital on November 14, 2023 and sent home with daily Flovent inhaler (steroid), albuterol inhaler as needed for wheezing, and Tylenol and Advil as needed for fever and pain.

24. On December 14, 2023, K.U. again visited urgent care for an asthma flare up. Urgent care administered three breathing treatments with the nebulizer and steroids. After those treatments did not achieve the expected result, K.U. was admitted to the emergency department where the doctors continued to administer breathing treatments and monitor his asthma symptoms and was diagnosed with status asthmaticus for the first time. K.U. was discharged on December 15, 2023, and was advised to continue ibuprofen, Tylenol, Flovent inhaler twice daily, and albuterol inhaler daily as needed for breathing issues. In this visit is that K.U. was sent home with an additional steroid treatment, liquid prednisone, to be administered once per day for four days. Both treatment and diagnosis increased during this visit.

25. On or about December 19, 2023, after K.U. was discharged from the hospital, Ms. Underwood again asked property manager, Laura Storms, to make repairs to the leaks in her apartment and weather stripping and provided Laura Storms with a letter from Primary Care Provider Dr. Amrik Khalsa explaining that extremes in temperature and exposure to mold can exacerbate symptoms of K.U.'s disabilities. An authentic copy of the letter is attached as Exhibit 3.

26. On January 4, 2024, K.U. was seen by pulmonologist, Brooke Gustafson, for management of his asthma. During this visit, it was noted that the mold in the home was not being resolved despite mother requesting repairs. During this visit, the doctor wrote a reasonable accommodation letter for the conditions of the apartment to be corrected, and air quality increased in order to help manage K.U.'s asthma.

27. Since moving out on April 22, 2024, K.U. has not required emergency department visits, nor has he needed admission to the hospital for managing his asthma or breathing issues. K.U. was seen once for an asthma flare up in August of 2024.

Conditions and Retaliation

28. As a result of K.U.'s multiple hospitalizations, Ms. Underwood's hours were cut, and she was no longer scheduled to work because of the frequency of her absences resulting from having to attend to K.U.'s breathing and medical needs.

29. Because Ms. Underwood did not bringing in the same income as before, she fell behind on her rent which resulted in the first eviction filing in September of 2023.

30. This first eviction filing was dismissed, upon information and belief, because Ms. Underwood caught up on her rent with rental assistance.

31. In September 2023, a leak developed under the bathroom sink, the tub faucet, and the shower head at the premises. The leak started as a slow drip that developed into a fast drip that required buckets under the sink.

32. Upon information and belief, in September 2023, Ms. Underwood notified Defendants via online portal of water leaks and need for replacing the weather stripping to the front door of the premises.

7

33. Despite being notified, Defendants failed to remedy the leak causing the paint under the sink to peel and the sides and base of the cabinets to become discolored.

34. Over time, the white cabinets became waterlogged, developed a color, and mold started to grow.

35. Upon information and belief, Ms. Underwood again notified Defendant's agent Laura Storm in person at the property management office that mold was developing from the leak and renewed her request for repairs. The property manager insisted that someone would be out to make repairs, but no one showed.

36. Soon after the leak began, K.U.'s, Asthma started flaring up and he required frequent medical visits.

37. in November 2023, after the flare up of K.U.'s symptoms, Ms. Underwood notified Laura Storms in the property management office that her son's breathing issues were flaring up and that the mold was making things worse. She begged for property management to make repairs.

38. Upon information and belief, Defendants did not request provider verification of K.U.'s disabilities in response to the reasonable accommodation request made. Instead, Defendants responded by stating that someone would come out and make repairs soon. No one showed up to make repairs to Ms. Underwood's apartment.

39. On December 1, 2023, Ms. Underwood was again unable to pay her rent because her hours were cut due to missing work for K.U.'s frequent medical visits which resulted in a second eviction in December 2023.

40. As previously stated, on December 19, 2023, after K.U. was discharged from the hospital, Ms. Underwood again asked property manager, Laura Storms, to make

repairs to the leaks in her apartment and weather stripping and provided Laura Storms with a letter from Primary Care Provider Dr. Amrik Khalsa explaining that extremes in temperature and exposure to mold can exacerbate symptoms of K.U.'s disabilities. Exhibit 3.

41. At the hearing for the second eviction on January 18, 2024, Ms. Underwood, through counsel, provided Defendants a letter from K.U.'s Pulmonary Medicine doctor, Brooke Gustafson, informing the nature of K.U.'s disabilities and explaining what triggers flare ups of his disabilities and that his asthma has not been well controlled and that he was experiencing frequent illnesses and doctor's visits. The letter requested "proper remediation of any sources of water leakage and/or damage and mold," and if this was not possible a new unit free from these conditions in order to optimize K.U.'s health. An authentic copy of the letter is attached as Exhibit 4.

42. On January 18, 2024, Defendants and Ms. Underwood entered into an agreed entry that allowed Plaintiffs to stay at the property if rental assistance paid the back balance and Ms. Underwood paying rent on time through April 2024. This agreed entry included Defendant's response to Ms. Underwood's presentation of the doctor's verification of the reasonable accommodation request in Paragraph 4 which stated:

> "[Ms. Underwood] has made [College Park] aware of conditions issues in her current rental unit that have the potential to impact tenant health by providing a letter from Nationwide Children's Hospital requesting reasonable accommodation. [College Park] has agreed to send maintenance technicians to inspect and remedy the said conditions issues. [College Park] agrees to have the unit inspected and evaluated for mold by a qualified contractor after repairs have been made to determine whether any potential mold or moisture issues affecting air quality have been remedied.   a. In the instance these conditions cannot be remedied, [College Park] agrees to put [Ms. Underwood] at the top of a waitlist for an alternative unit. When a unit becomes available, [College Park] will notify

9

    the [Ms. Underwood] of any additional costs associated with the unit. If the unit is not one that the [Ms. Underwood] can pay the rent increase for, [College Park] shall place tenant back at the top of the waitlist."

43. On or about January 24, 2024, Code Enforcement for the City of Columbus inspected the Premises and issued the following code violations to be corrected within 30 days: (1) "**4525.05 Safe equipment and facilities** Bathroom: there is a mold-like substance on the inside of the vanity. The backsplash on the countertop needs caulking;" and (2) "**4523.03 Windows in bathrooms** The window area in bathrooms shall be not less than two (2) square feet and not less than one-half (1/2) such area shall be capable of being opened, except that windows are not required in bathrooms equipped with a ventilation system approved by the code enforcement officer. . . The ventilation fan does not work." An authentic copy of the Columbus City Code Violation Notice is attached as Exhibit 5, (emphasis from original).

44. On January 31, 2024, Defendants provided Ms. Underwood with a written notice to enter stating that they do not have a key to her unit, and they intended to enter to "inspect" and if she did not give them a key, they would drill off her locks. An authentic copy of this letter is attached as Exhibit 6. Defendant had previously provided the management company with a copy of the key that the management company provided her, and she never changed the locks. Upon information and belief, whenever the landlord needed entry to the unit previously, Ms. Underwood would make sure that she or one of her family members were there to let the maintenance workers into her home.

45. On February 1, 2024, Defendants only cleaned and made repairs to the leaking sink and tub but failed to repair the bathroom fan and the weather stripping of the front door that was allowing cold air to come into the house.

46. In mid-February, 2024, Ms. Underwood went into the management office and inquired with Laura Storms, the property manager, about the remaining repairs. Laura Storms responded by raising her voice to a level Ms. Underwood received as yelling asking why Ms. Underwood gave her the letter through her attorneys and threatened to drill her locks off to get into her unit despite her having given them a copy of her key.

47. Upon information and belief, no additional repairs were made or attempted in response to the conversation in mid-February, 2024.

48. On February 26, 2024, counsel for Ms. Underwood emailed Defendants' counsel, Cassone Law, LLC, in the second eviction case notifying them that the air quality and mold inspection by a qualified contractor did not occur and following up on the repairs to the bathroom fan and the front door weather stripping. Cassone Law, LLC never responded.

49. Eventually, upon information and belief, the conditions at the Premises continued to worsen. The paint on the ceiling began to peel and the moisture in the bathroom increased to a level that was distinctly noticeable compared to the rest of the unit.

50. Upon information and belief, in early March 2024, Ms. Underwood called the main line for property management and a member of the management staff answered the phone. Ms. Underwood requested that they fix things immediately because of K.U.'s asthma. The very next day, Defendants made repairs to the tub and front door

weather stripping but did not conduct the air quality and mold inspection and upon information and belief, did not make the repairs cited by Code Enforcement to the ventilation fan.

51. On or about April 5, 2024, the premises was inspected for mold by a qualified contractor. Upon information and belief, the contractor swabbed certain areas of the home and inspected the vents. The swabs gave instant results that came back showing extremely high levels of mold. An authentic copy of the results are attached here as Exhibit 7.

52. On April 10, 2024, counsel for Ms. Underwood emailed Defendants' counsel Cassone Law, LLC making a reasonable accommodation request to terminate Ms. Underwood's lease agreement effective 11:59p.m. on April 18th without penalty because the mold had been causing K.U. severe breathing issues. Attached to this email was a picture of the mold test and the letter previously provided to Defendants on January 18, 2024, from K.U.'s provider.

53. Upon information and belief, neither Cassone Law, LLC nor Defendants responded to the reasonable accommodation request for Ms. Underwood to break her lease to move to ameliorate the effects of the conditions on K.U.'s disabilities.

54. Upon information and belief, after Counsel for Plaintiffs made the reasonable accommodation request to terminate Ms. Underwood's lease without penalty, Defendants turned off her internet, stopped her trash service, and the maintenance man slammed the trash compactors down and verbally abused Ms. Underwood.

55. Despite not having heard back from Defendants, Plaintiffs moved out on April 22, 2024, and Ms. Underwood notified Defendants in writing and dropped off the keys to the property management office.

56. The aggravation of K.U.'s symptoms were proximately caused by the living conditions and failure to follow through with K.U.'s reasonable accommodation request.

57. Since leaving the Premises, K.U.'s asthma and breathing symptoms have improved and the need for doctor's visits for those conditions have decreased in both frequency and level of care.

58. Upon information and belief, K.U. has experienced developmental delays, including speech caused in part or aggravated by his frequent hospitalizations for his breathing conditions.

## FIRST CLAIM FOR RELIEF
### (Violation of Federal Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B))

59. Plaintiffs reallege and incorporate by reference each of the proceeding paragraphs as fully rewritten.

60. Defendants violated 42 U.S.C. §3604(f) by discriminating against K.U. because of his disability and by not reasonably accommodating his disability. *See also* 24 C.F.R. § 100.204.

61. Defendants own more than three rental properties, subjecting it to the Fair Housing Act, 42 U.S.C. 3603(b)(1). Specifically, College Park Apartments, owns and/or manages the entire College Park Apartment Homes complex as evidenced by the Franklin County Auditor and Blue Leaf Residential's website.

62. Ms. Underwood rented the premises from Defendants as her primary residence, as such is covered by the protections of the Fair Housing Act, 42 U.S.C. 3602(b).

63. The Fair Housing Act makes it unlawful: "(b) to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of a handicap of – (A) that person; or (B) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available." 42 U.S.C. 3604(f).

64. Because of Defendants' discriminatory conduct, Plaintiffs have suffered damages and are aggrieved persons within the meaning of 42 U.S.C. §3602(i).

65. These actions caused harm to Ms. Underwood causing her to miss work, incur multiple application fees because she was denied for various reasons including that she was still in a lease, she suffered emotional distress, pain and suffering. Both Ms. Underwood and K.U. suffered consequential and incidental damages.

66. These actions caused K.U. to endure unsafe living conditions for a person with his disabilities, resulting in an aggravation of his medical conditions including frequent hospitalizations, increased treatment levels, and developmental delays.

67. While engaged in the acts and conduct complained of, Defendants, jointly and severally, acted intentionally, maliciously, and in wanton and reckless disregard of the rights and feelings of Plaintiffs, causing Plaintiffs to suffer damages.

**SECOND CLAIM FOR RELIEF**
**(Defendant's Engaged in Retaliatory Conduct in Violation of Federal Fair Housing Act, 42 U.S.C. § 3617)**

68. Plaintiffs reallege and incorporate by reference each of the proceeding paragraphs as fully rewritten.

69. 42 U.S.C. § 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

70. Defendants engaged in unlawful retaliatory behaviors as described in paragraphs 45, 47, and 55, after agreeing to grant the reasonable accommodation request in January 2024.

71. While engaged in the acts and conduct complained of, Defendants, jointly and severally, acted intentionally, maliciously, and in wanton and reckless disregard of the rights and feelings of Plaintiffs, causing Plaintiffs to suffer damages.

**THIRD CLAIM FOR RELIEF**
**(Disability Discrimination in Violation of O.R.C. §§ 4112.02(H)(19) and (12))**

72. Plaintiffs reallege and incorporate by reference each of the proceeding paragraphs as fully rewritten.

73. Ms. Underwood rented the subject premises from Defendants as her primary residence and thus is covered by the protection of the Ohio Fair Housing Law, O.R.C. § 4112.02(H)(4)

74. Ms. Underwood is covered under O.R.C. § 4112.02(H)(16)(C) and K.U. is covered under 4112.02(H)(16)(B).

75. Ohio Fair Housing Law makes it unlawful to: "[d]iscriminate against any person in the terms or conditions of selling, transferring, assigning, renting, leasing, or subleasing any housing accommodations or in furnishing facilities services, or

privileges in connection with the ownership, occupancy, or use of any housing accommodations, including the sale of fire, extended coverage, or homeowners insurance, because of race, color, religion, sex military status, familial status, ancestry, disability, or national origin or because of the racial composition of the neighborhood in which the housing accommodations are located[.]" O.R.C. § 4112.02(H)(4).

76. Specifically, Ohio Fair Housing law makes it unlawful to "Refuse to make reasonable accommodations in rules, policies, practices, or services when necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling unit, including associated public and common use areas." O.R.C. § 4112.02(H)(19).

77. Additionally, Ohio prohibits retaliation by a housing provider for a covered person's attempts to assert their rights under state Fair Housing law. O.R.C. § 4112.02(H)(12).

78. Defendants, by committing the acts alleged above, have violated O.R.C. §§ 4112.02(H)(19) and (12).

79. As stated above, Defendants failed to grant the reasonable accommodation request made by Ms. Underwood both orally in person and in writing on behalf of K.U. on multiple occasions between September 2023 and December 2023.

80. Despite agreeing to grant the reasonable accommodation in late January 2024, Defendants effectively denied the request by delaying the repairs and inspections by months.

81. Defendants engaged in unlawful retaliatory behaviors as described in paragraphs 45, 47, and 55, after agreeing to grant the reasonable accommodation request in January 2024

82. These Actions caused K.U. to endure unsafe living conditions for a person with his disabilities which impacted his health, resulting in more frequent hospitalizations.

83. While engaged in the acts and conduct complained of, Defendants, jointly and severally, acted intentionally, maliciously, and in wanton and reckless disregard of the rights and feelings of Plaintiffs, causing Plaintiffs to suffer damages.

## FOURTH CLAIM FOR RELIEF
(*Negligence Per Se* - Violation of O.R.C. § 5321.04)

84. Plaintiffs reallege and incorporate by reference each of the proceeding paragraphs as fully rewritten.

85. Defendants, by failing to make timely repairs upon notification by Plaintiff Underwood and issuance of code violation orders by the city of Columbus division of Code Enforcement, have violated O.R.C. § 5321.04.

86. A landlord's failure to maintain or repair the premises in violation of an O.R.C. § 5321.04(A) obligation constitutes negligence per se. *Sikora v. Wenzel*, 88 Ohio St. 3d 493 (2012).

87. Defendants' violation of O.R.C. § 5321.04 was the proximate cause of K.U.'s breathing and respiratory conditions worsening and the proximate cause of Ms. Underwood's discomfort relating to the conditions and her son's worsening health conditions, entitling them both to damages.

## FIFTH CLAIM FOR RELIEF
Violation of O.R.C. § 5321.15)

17

88. Plaintiffs reallege and incorporate by reference each of the proceeding paragraphs as fully rewritten.

89. O.R.C. § 5321.15(A) makes it unlawful for a landlord of a residential premises to "initiate any act, including termination of utilities or services, exclusion from the premises, or threat of any unlawful act, against a tenant, or a tenant whose right to possession has terminated, for the purpose of recovering possession of residential premises, other than as provided in Chapters 1923., 5303., and 5321. of the Revised Code."

90. Defendants, by committing the acts alleged in paragraph 55 have violated O.R.C. § 5321.15(A) as they discontinued services and utilities with the intention of forcing Ms. Underwood and K.U. out of their home without following Ohio's statutory procedures for eviction under O.R.C. § 1923.

91. Plaintiffs are entitled to compensatory damages and reasonable attorney's fees under O.R.C. § 5321.15(C) for Defendants' actions.

## SIXTH CLAIM FOR RELIEF
### (Breach of Contract)

92. Plaintiffs reallege and incorporate by reference each of the proceeding paragraphs as fully rewritten.

93. A landlord who fails to maintain residential premises as required by O.R.C. § 5321.04 is liable for damages for breach of contract, as the rental agreement with the tenant necessarily incorporates the duties imposed by Chapter 5321.

94. Defendants had actual notice of deficiencies in the conditions of residential premises.

95. Defendants failed to remedy these conditions in a timely manner.

96. Plaintiffs suffered consequential and special damages as a result of this breach of contract including but not limited to increased water bills, lost wages, and decreased living conditions.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests this Court to grant the following relief:

A. Declare the acts of the Defendants violated 42 U.S.C. § 3601, *et seq.*, and O.R.C. § 4112.02(H);

B. Award Plaintiffs compensatory damages and pre-and post-judgment interest;

C. Award Plaintiffs punitive damages;

D. Award Plaintiffs attorneys' fees and costs; and

E. Grant such additional legal and equitable relief as the Court deems just.


Respectfully submitted,

*/s/Edward A. Icove*_____
Edward A. Icove, #0019646
**Icove Legal Group, Ltd.**
50 Public Square, Suite 3220
Cleveland, Ohio 44113
Phone: (216) 802-0000
Fax: (216) 802-0002
Email: ed@icovelegal.com


*/s/ Kaci Philpot*_____
Kaci Philpot, #0099501
**Legal Aid of Southeast and Central Ohio**
1108 City Park Ave, Suite 100
Columbus, Ohio 43206
Phone: (614) 407-5523
Fax: (614) 224-4514
Email: kphilpot@lasco.org

*Attorneys for Plaintiff*

## **JURY DEMAND**

A jury is hereby demanded on all legal issues.

>*/s/ Kaci Philpot*
>Kaci Philpot
>***Attorney for Plaintiff***